Slip Op. 14-135

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **ALBEMARLE CORP.**, | |
| Plaintiff, | |
| and | |
| **NINGXIA HUAHUI ACTIVATED CARBON CO., LTD.**, | |
| Plaintiff-Intervenor, | **Before: Timothy C. Stanceu, Chief Judge** |
| v. | **Consol. Court No. 11-00451** |
| **UNITED STATES**, | |
| Defendant, | |
| and | |
| **CALGON CARBON (TIANJIN) CO., LTD., CALGON CARBON CORP. AND NORIT AMERICAS INC.**, | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[Affirming a redetermination issued upon remand in an action contesting the final results of an administrative review of an antidumping duty order on certain activated carbon from the People's Republic of China]

Dated: November 24, 2014

*Jeffrey S. Grimson*, Mowry & Grimson, PLLC, of Washington, DC, for plaintiff Albemarle Corp. and plaintiff-intervenor Ningxia Huahui Activated Carbon Co., Ltd. With him on the brief were *Kristin H. Mowry*, *Jill A. Cramer*, and *Sarah M. Wyss*.

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, DC, for plaintiff Shanxi DMD Corp. With him on the brief were *John J. Kenkel* and *J. Kevin Horgan*.

*Francis J. Sailer*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.,

Beijing Pacific Activated Carbon Products Co., Ltd. and Cherishmet Inc.  With him on the brief were *Mark E. Pardo*, *Andrew T. Schutz*, and *Kavita Mohan*.

 *Antonia R. Soares*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of counsel on the brief was *Devin S. Sikes*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

 *Craig A. Lewis*, Hogan Lovells U.S. LLP, of Washington, DC, for defendant-intervenor Calgon Carbon (Tianjin) Co., Ltd.

 *David A. Hartquist*, Kelley Drye & Warren LLP, of Washington, DC, for defendant-intervenors Calgon Carbon Corp. and Norit Americas Inc.  With him on the brief were *R. Alan Luberda* and *John M. Herrmann II*.

 Stanceu, Chief Judge: This consolidated action arose from judicial challenges to a final determination that the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued in an antidumping duty proceeding.[1]  The contested determination (the "Final Results") concluded the third administrative review of an antidumping duty order (the "Order") on certain activated carbon (the "subject merchandise") from the People's Republic of China ("China" or the "PRC").  *Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review*, 76 Fed. Reg. 67,142 (Int'l Trade Admin. Oct. 31, 2011) ("*Final Results*").  The third administrative review applies to entries of subject merchandise that were made between April 1, 2009 and March 31, 2010 (the "period of review" or "POR").  *Id.*

 Before the court is the Department's decision ("Remand Redetermination") issued pursuant to the court's order in *Albemarle Corp. v. United States*, 37 CIT __, __, 931 F. Supp.

---

 [1] The cases consolidated under this action are *Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. et al v. United States*, Court No. 11–00468 and *Shanxi DMD Corp. v. United States*, Court No. 11–00475.  Order (Jan. 26, 2012), ECF No. 34.

2d 1280, 1282-83 (2013) ("*Albemarle*").[2]  Final Results of Redetermination Pursuant to Ct.

Remand (Jan. 10, 2014), ECF No. 96 ("*Remand Redetermination*").  For the reasons discussed in

this Opinion, the court is affirming the Remand Redetermination.

## I. BACKGROUND

The court's opinion in *Albemarle* provides detailed background information on this case

that is supplemented herein.  *Albemarle*, 37 CIT at __, 931 F. Supp. 2d at 1283-88.

### A.  The Parties to the Consolidated Action

This consolidated case arose from challenges to the Final Results by three plaintiffs:

(1) Albemarle Corporation ("Albemarle"), a U.S. importer of subject merchandise produced and

exported from China by plaintiff-intervenor Ninxia Huahui Activated Carbon Co., Ltd.

("Huahui"); (2) Shanxi DMD Corporation ("Shanxi DMD"), a Chinese exporter of subject

merchandise; and (3) Cherishmet, Inc., a U.S. importer affiliated with Chinese exporters Ningxia

Guanghou Cherishmet Activated Carbon Products Company, Ltd. ("GHC") and Beijing Pacific

Activated Carbon Products Company, Ltd. ("BPAC").  *Albemarle*, 37 CIT at ___, 931 F. Supp.

2d at 1283-84.

---

[2] Also before the court are two motions pertaining to a brief filed by defendant-intervenors Calgon Carbon Corporation and Norit Americas, Inc. (collectively "CCC") that responds to the Remand Redetermination comments filed by plaintiff Albemarle Corporation ("Albemarle").  *See* Def.-intervenors' Responsive Comments on Remand Redetermination (Feb. 27, 2014), ECF No. 108.  Albemarle moves to strike CCC's response brief from the record of this case.  Mot. to Strike 1 (Feb. 28, 2014), ECF No. 110.  CCC concedes that its response brief contravened the terms of the court's order in *Albemarle Corp. v. United States*, 37 CIT __, __, 931 F. Supp. 2d 1280, 1282-83 (2013), but asks that the court accept the filing as supplemental briefing and allow additional briefing from the other parties to this litigation.  Def.-intervenors' Mot. to Accept Supplemental Br. 1 (Feb. 28, 2014), ECF No. 111.  Because all parties already have had the opportunity to comment on the Remand Redetermination, the court determines that permitting additional briefing would not promote the judicial economy and efficiency of this case.  *See* USCIT R. 1.  Moreover, CCC's supplemental brief argues in support of a determination that the court has concluded it will sustain; *see* part II.B of this Opinion.  The court reaches this conclusion without considering the brief in question.  Therefore, the court will grant Albemarle's Motion to Strike and deny CCC's Motion for Supplemental Briefing.

Defendant-intervenor Calgon Carbon (Tianjin) Co., Ltd. ("CCT") is a Chinese producer

and exporter of subject merchandise.  CCT is a subsidiary of defendant-intervenor Calgon

Carbon Corporation and Norit Americas, Inc. (collectively "CCC"), a domestic producer of

activated carbon and the petitioner in the antidumping investigation that resulted in the issuance

of the Order.  *Albemarle*, 37 CIT at ___, 931 F. Supp. 2d at 1284.

## B.  Procedural History

In the third administrative review, Commerce examined individually, and assigned

individual calculated margins to, only two producer/exporters ("mandatory respondents"): CCT,

which is a party to this case, and Jacobi Carbons AB ("Jacobi"), which is not. *Certain Activated*

*Carbon from the People's Republic of China: Prelim. Results of the Third Antidumping Duty*

*Admin. Review, & Prelim. Rescission in Part*, 76 Fed. Reg. 23,978, 23,979 (Int'l Trade Admin.

Apr. 29, 2011) ("*Prelim. Results*").  In the preliminary phase of the third administrative review,

Commerce determined a preliminary margin of zero for Jacobi and a $0.05/kg. preliminary

margin for CCT.  *Id.*, 76 Fed. Reg. at 23,990.  Based on CCT's margin, Commerce determined

preliminary margins of $0.05/kg. for respondents Shanxi DMD, BPAC, GHC, and Huahui, each

of which Commerce had chosen not to examine but which qualified for a "separate rate," i.e., a

rate other than the rate assigned to the government of China and government-affiliated entities.[3]

*Id.*

---

[3] The International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") makes the rebuttable presumption that all companies operating within the People's Republic of China ("China" or the "PRC") to be under government control, and because the PRC government did not cooperate in the Department's conducting of the review giving rise to this action, Commerce, pursuant to 19 U.S.C. § 1677e(b), determined a "PRC-wide" margin of $2.42/kg. for application to all Chinese exporters and producers of the subject merchandise that did not establish their entitlement to a "separate rate," i.e., a rate other than the PRC-wide rate, by demonstrating their *de jure* and *de facto* independence from government control.  *Certain Activated Carbon from the People's Republic of China: Final* (continued . . .)

In the Final Results, Commerce assigned to each of the two examined respondents a margin of "$0.00/kg.," which Commerce described as "*de minimis*." *Final Results*, 76 Fed. Reg. at 67,145. Commerce determined a final margin of $0.44/kg. for Huahui based on the individual margin Huahui had been assigned as a mandatory respondent in the final results of the previous (second) administrative review of the Order, and determined a margin of $0.28/kg. for unexamined respondents Shanxi DMD, BPAC and GHC, which was also based on the final results of the second administrative review. *Id.*

In *Albemarle*, the court granted defendant's motion for a voluntary remand that would allow Commerce to reconsider two surrogate values (for carbonized material and for coal and fines by-products) affecting the calculation of CCT's margin. *Albemarle*, 37 CIT at __, 931 F. Supp. 2d at 1297. Also, the court in *Albemarle* ordered Commerce to reconsider the method used to determine the margins for unexamined respondents Shanxi DMD, BPAC and GHC and redetermine those margins in accordance with the court's opinion and order. *Id.* Third, the court ordered Commerce to reconsider the decision Commerce made in the Final Results to assign a per-unit, as opposed to an *ad valorem*, margin to Shanxi DMD and redetermine this margin in accordance with the opinion and order. *Id.* In *Albemarle*, the court reserved any decision on whether the $0.44/kg. margin assigned to Huahui was permissible but did not preclude Commerce from reconsidering that margin on remand. *Id.* at __, 931 F. Supp. 2d at 1293.

Commerce filed the Remand Redetermination with the court on January 10, 2014. *Remand Redetermination* 1. Pursuant to the court's order in *Albemarle*, the parties have

---

(…continued)

*Results and Partial Rescission of Third Antidumping Duty Administrative Review*, 76 Fed. Reg. 67,142, 67,145 (Int'l Trade Admin. Oct. 31, 2011) ("*Final Results*"). The Chinese producer/exporters of the subject merchandise at issue in this case were among the eight producer/exporters who so qualified.

submitted briefs addressing various issues raised by the Remand Redetermination.  Pl. and

Pl.-intervenor's Comments on Final Results of Redetermination Pursuant to Ct. Remand

(Feb. 12, 2014), ECF No. 100 ("Albemarle's Comments"); Comments of Def.-intervenor Calgon

Carbon (Tianjin) Co., Ltd. Regarding Final Results of Redetermination Pursuant to Ct. Remand

(Feb. 12, 2014), ECF No. 102 ("CCT's Comments"); Def.-intervenors' Comments on Remand

Redetermination (Feb. 12, 2014), ECF No. 103 ("CCC's Comments"); Def.'s Reply to the

Parties' Remand Comments, ECF No. 109 ("Def.'s Reply").

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a(a)(2)(B)(iii), including

an action contesting the Department's issuance, under section 751 of the Tariff Act, 19 U.S.C.

§ 1675(a), of the final results of an administrative review of an antidumping duty order.[4]  The

court will sustain the Department's redetermination if it complies with the court's remand order,

is supported by substantial evidence on the record and is otherwise in accordance with the law.

*See* 19 U.S.C. § 1516a(b)(1)(B)(i).

In the Remand Redetermination, Commerce reassessed its surrogate value determinations

for CCT's carbonized material and for CCT's coal and fines by-products.  *Remand*

*Redetermination* 1-2.  Accordingly, Commerce recalculated CCT's weighted average dumping

margin to reflect the redetermined surrogate values, resulting in a margin of $0.004/kg. for CCT,

which remained *de minimis*.  *Remand Redetermination* 10, 25.  Commerce assigned

---

[4] All statutory citations to the Tariff Act of 1930 are to the 2006 edition of the United States Code, unless otherwise indicated.

redetermined zero margins to unexamined respondents Shanxi DMD, BPAC and GHC, which

were based on the zero/*de minimis* margins for mandatory respondents Jacobi and CCT.  *Remand*

*Redetermination* 13, 25.  Commerce left unchanged the $0.44/kg. margin it assigned to Huahui

in the Final Results.

No party contests the Department's redetermined surrogate values, which the court

affirms for the reasons discussed in subparts II.C and II.D of this Opinion.  The margins to be

assigned to GHC, BPAC, and Shanxi DMD, and the margin to be assigned to Huahui, are the

only issues that remain contested in this litigation.  In subpart II.A of this Opinion, the court

affirms the Department's assignment of zero margins to GHC, BPAC, and Shanxi DMD.  In

subpart II.B, the court affirms the Department's assignment of the $0.44/kg. margin to Huahui.

Because Commerce determined Shanxi DMD's margin to be zero, and because the court affirms

that margin in this Opinion, Shanxi DMD's challenge to a per-unit margin is now moot.

A.  The Court Affirms the Redetermined Margins for GHC, BPAC, and Shanxi DMD

The Tariff Act provides generally that Commerce, in an antidumping duty investigation

or a review of an antidumping duty order, "shall determine the individual weighted average

dumping margin for each known exporter and producer of the subject merchandise."  Section

777A(c)(1) of the Tariff Act, 19 U.S.C. § 1677f-l(c)(l).  However, if "it is not practicable" to

calculate individual dumping margins for every exporter or producer "because of the large

number of exporters or producers involved" in the review, Commerce may limit the number of

examined respondents.  Section 777A(c)(2) of the Tariff Act; 19 U.S.C. § 1677f-1(c)(2).  In the

third administrative review, Commerce chose CCT and Jacobi for individual examination out of

ten companies that qualified for a separate rate "because it found that these two respondents were

the largest producer/exporters of subject merchandise during the POR." *Albemarle*, 37 CIT at __,

931 F. Supp. 2d at 1292 (footnote omitted).

In the Final Results, Commerce assigned an antidumping duty margin of $0.28/kg. to

unexamined respondents GHC, BPAC, and Shanxi DMD. *Final Results*, 76 Fed. Reg. at 67,145

& n.26.  As it explained in an Issues & Decision Memorandum ("Decision Memorandum")

incorporated by reference in the Final Results, Commerce obtained this margin from the

immediately preceding, i.e., second, administrative review of the Order, in which it had assigned

a margin of $0.28/kg. to nine unexamined, separate rate respondents. *Issues & Decision Mem*.

at 5, A-570-904, (Oct. 24, 2011), *available at*

http://enforcement.trade.gov/frn/summary/prc/2011-28158-1.pdf (last visited Nov. 18, 2014)

("*Decision Mem.*").  In the second administrative review, Commerce calculated the $0.28/kg.

margin as a simple average of the margins it determined for the two mandatory respondents it

examined individually in that review, which were Jacobi ($0.11/kg.) and Huahui ($0.44/kg.).

*Certain Activated Carbon From the People's Republic of China: Final Results and Partial*

*Rescission of Second Antidumping Duty Administrative Review*, 75 Fed. Reg. 70,208, 70,211

& n.10 (Int'l Trade Admin. Nov. 17, 2010).

No statutory or regulatory provision addresses the method by which Commerce is to

determine margins for respondents that are reviewed, but not individually examined, in an

administrative review of an antidumping duty order.  Rather, Congress left the method of

determining such margins to the Department's discretion.  That discretion is broad but not

unfettered.  According to long-standing precedent of the Court of Appeals for the Federal Circuit

("Court of Appeals"), "[a]n overriding purpose of Commerce's administration of antidumping

laws is to calculate dumping margins as accurately as possible." *Yangzhou Bestpak Gifts &*

*Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("*Bestpak*") (citing *Rhone*

*Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)); *Parkdale Intern. v. United*

*States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007); *Lasko v. United States*, 43 F.3d 1442, 1446 (Fed.

Cir. 1994) (citation omitted).

*Bestpak* involved an all-others rate Commerce applied to uninvestigated "separate rate"

respondents in an antidumping investigation. The Court of Appeals concluded that the margin

applied to these uninvestigated respondents not only must be determined "as accurately as

possible," *Bestpak*, 716 F.3d at 1379, but also must be one that "reflects economic reality," *id.*

716 F.3d at 1378. Rejecting the 123.83% margin Commerce applied to the separate rate

respondents, which Commerce calculated by taking a simple average of a zero/*de minimis*

margin assigned to an investigated respondent and a 247.65%, adverse inference margin assigned

to an uncooperative respondent, the Court of Appeals held that the record lacked "substantial

evidence to support the calculated margin as being a reasonable reflection of Bestpak's potential

dumping margin." *Id.*, 716 F.3d at 1375, 1378.

*Bestpak* arose from an antidumping investigation, not a review as does this case.

Nevertheless, the court considers the objectives of obtaining the most accurate margin possible

and of ensuring that the margin reflects economic reality, both of which the Court of Appeals in

*Bestpak* viewed as fundamental to the antidumping statute, to be as valid in a review as they are

in an investigation. To meet the *Bestpak* standard, the margins assigned to Shanxi DMD, BPAC

and GHC must be a reasonable reflection of the potential dumping margins of these respondents.

For the Final Results, Commerce stated in the Decision Memorandum that in selecting

the $0.28/kg. margin it had been guided by section 735(c)(5) of the Tariff Act, 19 U.S.C.

§ 1673d(c)(5), which provides the methodology for calculating the "all-others" rate that is

applied to uninvestigated producer/exporters in an antidumping investigation.  *Decision Mem.* 4

("Generally, we have looked to section 735(c)(5) of the Tariff Act . . . , which provides

instructions for calculating the all-others rate in an investigation, for guidance when calculating

the rate for respondents we did not individually examine in an administrative review.").  Under

paragraph (A) of § 1673d(c)(5), Commerce determines the all-others rate in an investigation by

calculating "the weighted average of the estimated weighted average dumping margins

established for exporters and producers individually investigated, excluding any zero and *de*

*minimis* margins, and any margins determined entirely under section 776, [19 U.S.C. § 1677e]."

19 U.S.C. § 1673d(c)(5)(A).  Because it assigned zero/*de minimis* margins to both respondents it

examined in the third review, Commerce could not apply the paragraph (A) method in the review

to determine an all-others rate for the separate rate respondents.

The paragraph (A) method is subject to an exception in paragraph (B), which provides

that if all of the individually investigated companies' margins "are zero or *de minimis* margins,

or are determined entirely under section 776, [19 U.S.C. § 1677e]," then Commerce "may use

any reasonable method to establish the estimated all-others rate for exporters and producers not

individually investigated, including averaging the estimated weighted average dumping margins

determined for the exporters and producers individually investigated."  19 U.S.C.

§ 1673d(c)(5)(B).  Commerce expressly cited the paragraph (B) exception in the Decision

Memorandum: "Section 735(c)(5)(B) of the Act also provides that, where all margins are zero,

*de minimis*, or based on total facts available, we may use 'any reasonable method' for assigning

the rate to non-selected respondents."  *Decision Mem.* 4.  Commerce added that "[o]ne method

that section 735(c)(5)(B) of the Act contemplates as a possibility is 'averaging the estimated

weighted average dumping margins determined for the exporters and producers individually

investigated.'" *Id.* (quoting 19 U.S.C. § 1673(c)(5)(B)).  In the Final Results, Commerce rejected that "possibility."

Commerce explained that it has a practice of "excluding zero and *de minimis* margins when calculating the separate rate margin." *Decision Mem.* 4.  Choosing to follow this practice in the Final Results, Commerce stated that "[b]ased on the facts of this case, we determine that a reasonable method for determining the margin for separate rate companies in this review is the average of the margins, other than those which are zero, *de minimis*, or based on total facts available, that we found for the most recent period in which there were such margins," *i.e.*, the second administrative review.  *Id.* at 5.  As Commerce also explained, "the Department does not consider the rates calculated in the current review [i.e., the zero/*de minimis* margins calculated for Jacobi and CCT] to reasonably reflect the potential dumping margins of the separate rate companies." *Id*.  According to Commerce, "no data on the record exists to determine whether the non-selected companies' pricing behavior matches that of the mandatory respondents in the current review." *Id.*  Acknowledging that it had departed from its practice by assigning a zero margin to separate rate respondents in one administrative review, *Honey from Argentina: Final Results of Antidumping Duty Admin. Review & Determination Not to Revoke in Part*, 73 Fed. Reg. 24,220 (Int'l Trade Admin. May 2, 2008), Commerce identified that review as the only instance in which it had done so voluntarily in its recent history.  *Decision Mem.* 6.  Commerce further stated in the Decision Memorandum:

> As seen in recent cases, the Department has found for case-specific reasons that using a calculated rate from a prior segment more reasonably reflects the potential dumping margins of non-selected companies than does a *de minimis* or zero rate from an ongoing segment because the margins from the previous review more accurately capture recent and potential pricing behavior of non-selected companies, given that these companies were not selected for individual examination and that there is no data on the record to determine whether the non-selected companies' pricing behavior matches that of the mandatory respondents

in the ongoing review.

*Id.* Commerce added that the only other instance in which it had departed from the practice in

recent history by assigning zero/*de minimis* margins to unexamined respondents was in response

to a remand order that this Court entered in *Amanda Foods (Vietnam) Ltd. v. United States*,

34 CIT __, 714 F. Supp. 2d. 1282 (2010) ("*Amanda Foods 2010*").  *Decision Mem.* 6.

Commerce explained that in that instance it assigned a *de minimis* separate rate "under protest"

and "only after the Department reopened the record, requested further information from the

plaintiff, and performed additional data comparisons to information on the record."  *Id.* (citing

*Amanda Foods (Vietnam) Ltd. v. United States*, 35 CIT __, __, 774 F. Supp. 2d 1286, 1292

(2011) ("*Amanda Foods 2011*")).  Commerce further explained that "the Department has not

undertaken such steps in this case and, therefore, finds it inappropriate to rely on *Amanda

Foods 2011* as applicable precedent."  *Decision Mem.* 6-7.

In *Albemarle*, the court rejected the $0.28/kg. margin for Shanxi DMD, BPAC and GHC

and the reasoning Commerce put forth.  Noting that "Commerce reverted to a margin it

determined in *another* review for *other* respondents," the court concluded that the $0.28/kg.

margin "was not based on data pertaining to any pricing behavior that occurred in the third POR"

and "does not reflect commercial reality with respect to Shanxi DMD, BPAC, and GHC."

*Albemarle*, 37 CIT at __, 931 F. Supp. 2d at 1291 (emphasis in original).  The court stated that

"[t]he Department's statement that this margin is based on a 'contemporaneous examination of

individually-reviewed respondents exclusive of zero, *de minimis* and facts available margins, and

reasonably reflects potential dumping margins for the non-selected companies,' *Decision

Mem.* 5, is factually incorrect when viewed in the context of the record evidence of the third

review."  *Id.* at __, 931 F. Supp. 2d at 1291.  Responding to the Department's conclusion that

there were "no data on the record to determine whether the non-selected companies' pricing

behavior matches that of the mandatory respondents in the instant review," the court observed

that no data on the record demonstrated that the pricing behavior of the three non-selected

companies matched the pricing behaviors of the mandatory respondents in the previous review,

from whose individually-determined margins the $0.28/kg. was calculated. *Id.* at __, 931 F.

Supp. 2d at 1292-93. The court directed Commerce to "reconsider its method of determining the

margins" for Shanxi DMD, BPAC, and GHC, and to redetermine those margins in accordance

with the court's order. *Id.* at __, 931 F. Supp. 2d at 1296-97.

In response to the court's order, Commerce decided to average the zero and *de minimis*

rates calculated for Jacobi and CCT and to assign the result, i.e., zero, as the margins for GHC,

BPAC, and Shanxi DMD. The court affirms the Department's decision to assign these margins,

which were derived from the actual margin Commerce determined in the Final Results for

Jacobi, and the actual margin Commerce determined in the Remand Redetermination for CCT,

based on record information pertaining to factors of production and examined sales occurring in

the relevant period of review, i.e., April 1, 2009 to March 31, 2010.[5] In this case, the margins

Commerce determined for Jacobi and CCT are no less actual, calculated margins because they

were *de minimis*. Because they were calculated from record data for examined sales made

during the correct period, they are necessarily a more "reasonable reflection of [the] potential

dumping margin," *Bestpak*, 716 F.3d at 1378, that GHC, BPAC, and Shanxi DMD would have

---

[5] The *de minimis* margin assigned to Jacobi, as determined in the decision under review, was not contested in this case. As discussed elsewhere in this Opinion, CCT's margin remained *de minimis* after redetermination, upon remand, of the surrogate values contested in this litigation.

been assigned in the third review, had they been examined, than is the margin of $0.28/kg.,

which bears no relationship to the relevant POR.

CCC opposes, on various grounds, the Department's decision to assign zero margins to

GHC, BPAC and Shanxi DMD.  CCC argues, first, that Commerce "misinterpreted this Court's

opinion and remand order as making factual findings and requiring the Department to assign

GHC, BPAC, and Shanxi DMD a zero percent separate rate on remand."  CCC's Comments 4.

According to CCC, another remand is appropriate because of the Department's "mistaken belief

that the Court dictated the separate rate to be assigned to GHC, BPAC, and Shanxi DMD."  *Id.*

at 7.  The court must reject this argument.  As discussed below, the text of the Remand

Redetermination does not support CCC's conclusion that Commerce considered itself under a

judicial directive to assign zero antidumping duty margins to GHC, BPAC, and Shanxi DMD.[6]

---

[6] Nothing in the court's opinion and order in *Albemarle* correctly could have been construed by Commerce as a directive to assign zero margins to GHC, BPAC, or Shanxi DMD. Regarding CCC's other point, the Remand Redetermination does not state that the court made factual findings.  Instead, disagreeing with comments CCC submitted to Commerce on a draft version of the remand decision, the Remand Redetermination attributed to the court's decision in *Albemarle* "substantive assessments" that the *de minimis* margins assigned to the mandatory respondents were more representative of industry-wide pricing behavior and more reflective of commercial realities during the POR than the $0.28/kg. margins Commerce assigned.  Final Results of Redetermination Pursuant to Ct. Remand at 20 (Jan. 10, 2014), ECF No. 96 ("*Remand Redetermination*").  In any event, the opinion and order in *Albemarle* did not draw its own findings of fact from the record evidence and instead took issue with the Department's reasoning.  The observations the court made concerning the record described the *absence* of evidence to support the Department's choice and were not directed to any contested factual issue. The court observed that the *de minimis* margins Commerce assigned to the two mandatory respondents in the third review were derived from data pertaining to sales occurring during the POR for that same review, which the $0.28/kg. margin was not; this point was not the subject of a factual dispute in the case.  *Albemarle*, 37 CIT at __, 931 F. Supp. 2d at 1292 ("While the *de minimis* margins assigned to Jacobi and CCT at least reflect commercial realities prevailing in the pertinent POR, the same cannot be said for the margin Commerce assigned to Shanxi DMD, BPAC, and GHC.").

The Remand Redetermination states that "[t]he Department respectfully disagrees with the Court's holdings in this *Remand Opinion and Order*," adding that "[h]owever, under protest, the Department has averaged the zero and *de minimis* rates calculated for Jacobi and CCT in this administrative review and assigned the resulting zero dumping margin to GHC, BPAC, and Shanxi DMD." *Remand Redetermination* 13 (citing *Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003)). The Remand Redetermination does not go so far as to conclude that the court directed Commerce to assign zero margins to GHC, BPAC, and Shanxi DMD. Instead, Commerce expresses disagreement with "the Court's holdings," explaining that it "followed the Court's logic, under protest, to its natural conclusion." *Id.* Implicitly acknowledging an alternative to its assigning zero margins to these three unexamined respondents, Commerce disagreed with CCC's comment, submitted in response to a draft version of the Remand Redetermination, that it should reopen the record to obtain pricing and other information from GHC, BPAC, and Shanxi DMD. *Id.* at 21; *see* CCC's Comments 13. The Remand Redetermination rejects this option on the ground that Commerce previously stated it has resources sufficient only to examine two respondents and that "obtaining this information would consume resources which we previously stated we do not have." *Remand Redetermination* 21.

When read in the entirety, the Remand Redetermination is correctly interpreted as protesting that the court remanded for reconsideration the Department's decision to assign the 0.28/kg. margin, and the logic by which the court did so, rather than protesting a directive to assign zero margins to GHC, BPAC, and Shanxi DMD. *See id.* (rejecting CCC's comment, submitted on the draft version of the decision, that Commerce should remove the "under protest" language and stating that "[a]s an initial matter, the Department may protest when ordered to

make a remand redetermination") & n.66 (citing *Viraj*, 343 F.3d 1371).  Commerce appears to

have viewed reopening the record as a possible alternative to assigning zero margins to GHC,

BPAC, and Shanxi DMD that was available to it on remand, albeit one Commerce chose not to

pursue due to resource constraints.  Having noted the absence of meaningful record evidence

concerning the sales of these three respondents, having rejected the option of reopening the

record in an effort to redress that absence, and also having noted the court's rejecting as

unreasonable the Department's decision to assign $0.28/kg. margins in the Final Results to GHC,

BPAC, and Shanxi DMD, the Remand Redetermination disagreed with CCC "that the CIT has

left us other options to pursue on remand."  *Remand Redetermination* 20.  That is not the same as

the Department's concluding that it was under a court order to assign the zero margins.

　　　CCC next argues that the court should issue a second remand because the decision to

assign the zero margins was unsupported by substantial record evidence.  CCC's Comments 7.

Based on the premise that the decision lacks evidentiary support, CCC further argues that "[t]he

Department's refusal to re-open the record on remand to obtain pricing and other relevant data to

determine if the mandatory respondents' commercial reality was representative of the separate

rate respondents was unreasonable and improper."  *Id.* at 12.  According to CCC, among the

types of information missing from the record is information "concerning the factors of

production consumed in manufacturing the subject merchandise exported to the United States by

GHC, BPAC, and Shanxi DMD" that is "necessary to determine the 'commercial reality' faced

by these separate rate respondents and whether that commercial reality bears a rational

relationship to the margins assigned to the mandatory respondents."  *Id.* at 10 (citing *Bestpak*,

716 F.3d at 1380).  On the subject of the Department's obtaining the missing information in

general, CCC argues that "[o]nly by collecting this information will the Department be able to

analyze whether the zero margins calculated for Jacobi and CCT are, in fact, reflective of the commercial reality for the separate rate respondents." *Id.* at 14.  The court rejects these arguments as well.

The record contains evidence consisting of data Commerce used to calculate the *de minimis* margins Commerce assigned to Jacobi and CCT in the third review and in the remand proceeding, respectively.  These data pertain to sales and factors of production that are contemporaneous with the POR and are individual to the two highest-volume respondents in the review.  Because unexamined respondents are just that—unexamined—the statute, in 19 U.S.C. § 1677f-1(c)(2), must be read implicitly to contemplate that Commerce may be required to assign margins to one or more respondents for which the record lacks data pertaining to sales during the POR from which an individual margin could be separately calculated or separately estimated.  And as the Court of International Trade reasoned in *Amanda Foods (Vietnam) Ltd. v. United States*, 36 CIT __, __, 837 F. Supp. 2d 1338, 1346 (2012), an average of *de minimis* rates of mandatory respondents may serve as a reasonable all-others rate in an administrative review because it is supported by substantial evidence on the record of the review, in the form of the record information underlying those very rates.  For these reasons, the court disagrees with CCC's argument that it must order a second remand on the ground that the record lacked substantial evidence in support of the zero margins assigned by the Remand Redetermination to GHC, BPAC, and Shanxi DMD.  The court also disagrees with CCC's argument that Commerce improperly decided not to reopen the record.  Were the court now to adopt the extraordinary remedy of ordering Commerce to reopen the record in a second remand, in the circumstances presented it would be, in effect, an order to conduct some form of "examination" of unexamined respondents.  As the court discussed above, Congress, in enacting 19 U.S.C. § 1677f-1(c)(2),

implicitly contemplated that Commerce may be required to assign margins to one or more

respondents for which the record lacks individual data pertaining to sales during the POR.  In

summary, the circumstances presented do not support a conclusion that the decision to assign

zero margins to GHC, BPAC, and Shanxi DMD is unreasonable for lack of substantial evidence

or because of the Department's decision not to reopen the record.

Related to its arguments on the state of the record evidence, CCC also makes the

argument that the decision to assign the zero margins was "not adequately explained," and

therefore "arbitrary and capricious," on the ground that the Remand Redetermination fails to

explain how that decision is supported by substantial evidence.  CCC's Comments 11.  This

argument is unconvincing.

Even though it indicated disagreement with the logic employed by the court in

*Albemarle*, the Remand Redetermination adopted that logic as an explanation for the decision

Commerce made on remand, stating as follows:

> In assigning GHC, BPAC and Shanxi DMD zero dumping margins, we follow the
> Court's logic, under protest, to its natural conclusion—because Jacobi and CCT's
> margins are "more representative of industry-wide pricing behavior during the
> POR" and "more contemporaneous" than the non-POR margins relied upon in
> *AR3 Final Results* [i.e., the Final Results of the third administrative review],
> applying the Jacobi and CCT's margins to CCT, BPAC and Shanxi DMD will
> achieve a "more representative" result than would relying upon non-POR
> margins.

*Remand Redetermination* 13.  Responding to a comment CCC made on the draft version of the

remand decision in opposition to the zero margins, the Remand Redetermination also reasons

that "the contemporaneity of the mandatory respondents' dumping margins—the only margins

calculated during this POR—demonstrates that these margins reasonably reflect potential

dumping margins for companies not individually investigated (without a company-specific rate

calculated in the immediately preceding review) during the same time."  *Id.* at 19.  The court

must view the Department's explanation in light of the circumstances presented by the state of

the record and the Department's need to determine, in the context of 19 U.S.C. § 1677f-1(c),

antidumping duty margins for CCT, BPAC and Shanxi DMD—none of which was an examined

respondent.  When so viewed, the explanation Commerce provided is not deficient and therefore

not a valid basis upon which the court may order a second remand.

### B.  Commerce Permissibly Determined the Margin it Assigned to Huahui

In the third administrative review, Commerce assigned Huahui, as an unexamined

respondent, a $0.44/kg. margin corresponding to the $0.44/kg. margin Huahui had been assigned

as a mandatory respondent in the second administrative review.  In *Albemarle*, the court

"reserve[d] any decision on whether the margin assigned to Huahui was permissible," reasoning

that "Commerce may or may not decide to assign Huahui a different margin based on other

decisions it makes upon remand."  *Albemarle*, 37 CIT at __, 931 F. Supp. 2d at 1293.

The Remand Redetermination provides the following explanation for the decision to

continue to assign to Huahui, as an unexamined respondent in the third administrative review,

the $0.44/kg. margin based on the margin calculated for Huahui in the previous review:

> We decline to reconsider Huahui's dumping margin and continue to find that, for
> the reasons provided in the IDM [Decision Memorandum] and the Government's
> response in opposition to the summary judgment motions, the margin assigned to
> Huahui is reasonably reflective of potential dumping margins during the POR,
> especially given that (1) the margin is specific to Huahui and temporally
> proximate to the third administrative review (i.e., separated at most by twelve
> months) and (2) zero or *de minimis* dumping margins had never previously been
> calculated for mandatory respondents during the course of the subject
> antidumping duty order.

*Remand Redetermination* 22.

The court concludes that Commerce applied a reasonable method to determine the margin

for Huahui in the third administrative review.  The Department's method relies upon data that

were specific to Huahui's sales and factors of production.  The data pertained to the previous, not

the current, period of review, but analogous data pertaining to the POR for the third review are absent from the record because Huahui was an unexamined respondent in the third review.  In the words of *Bestpak*, 716 F.3d at 1378, Commerce permissibly could conclude that the $0.44/kg. margin is a "reasonable reflection" of the potential margin of Huahui in the third review, had Huahui been an examined respondent.

Albemarle opposes the assignment to Huahui of the $0.44/kg. margin, which it describes as lacking "the reasonableness and rational explanation required by law," and argues that "the Court should remand the issue to Commerce to assign Huahui the same rate it has determined on remand for every other separate rate respondent in the current review."  Albemarle's Comments 4.  The court disagrees.

As the court discussed previously, Commerce must be afforded considerable discretion in choosing a method of determining a margin for an unexamined respondent in an administrative review.  Commerce chose a margin that was calculated in the preceding review and was individual to Huahui.  It chose this margin over a margin derived from the margins calculated for the two mandatory respondents in the current review or a margin calculated in some other way. In rejecting the option of assigning Huahui the zero margin assigned to other unexamined respondents, Commerce chose specificity to Huahui over contemporaneity.  Because the Department's choice was not an unreasonable one, the court concludes that Commerce acted within its discretion.

Albemarle raises various objections to the Department's decision.  It cites the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1 at 873 (1994) *reprinted in* 1994 U.S.C.C.A.N. 4040, 4021, ("*SAA*") as providing that "the expected method is to 'weight average the zero and *de minimis* margins and

margins determined pursuant to the facts available, provided that volume data is available.'"

Albemarle's Comments 4 (quoting *SAA* at 873, 1994 U.S.C.A.A.N. at 4201).  The language

Albemarle quotes pertains to a statutory provision, 19 U.S.C. § 1673d(c)(5), governing the

selection of an all-others rate in an antidumping duty investigation, not a review.  Although

Commerce stated in the Decision Memorandum that it obtains guidance from this investigation-

related provision in selecting an all-others rate in a review, *Decision Mem.* 4, Commerce was not

required to follow the "expected method."  Moreover, the Statement of Administrative Action

itself provides, in the sentence following the quoted language, that "if this method is not feasible,

or if it results in an average that would not be reasonably reflective of potential dumping margins

for non-investigated exporters or producers, Commerce may use other reasonable methods."

*SAA* at 873, 1994 U.S.C.A.A.N. at 4201.

     Characterizing the Department's decision to assign the $0.44/kg. margin as unreasonable,

Albemarle argues that "[i]t defies logic and the parameters of the law for Commerce to single out

one respondent for a margin while determining that no other individual respondent has an

antidumping rate above *de minimis*."  Albemarle's Comments 5.  This argument is unpersuasive

because Commerce had a reasonable basis to distinguish Huahui from the unexamined

producer/exporters to which it assigned the zero margins: Huahui was individually examined and

assigned a calculated antidumping duty margin in the previous administrative review.

Commerce was within its discretion in considering that margin to be reasonably reflective of

Huahui's potential margin in the third review.  The decision was, therefore, neither illogical nor

outside the "parameters" of the Department's authority under the statute.

     Albemarle makes various arguments to the effect that Commerce failed to provide a

satisfactory explanation for choosing to assign Huahui the rate from the previous review instead

of the zero rate.  The court does not consider the explanation provided in the Remand

Redetermination to be a ground upon which to overturn the Department's decision.  Most

significant in that explanation is the Department's reasoning that "the margin is specific to

Huahui and temporally proximate to the third administrative review," *Remand*

*Redetermination* 22, which reflects consideration of two relevant factors: the specificity of the

margin to Huahui and the reasonable proximity in time to the third review.  As to the latter

factor, Albemarle argues that "[s]urrogate values, and calculated dumping margins themselves,

can change wildly from review to review," Albemarle's Comments 6.  Although Albemarle is

correct in implying that, on the record of the third review, no one can know to what degree a

potential margin for Huahui in the third review would have varied from the individually-

determined margin in the second review, Commerce still was within its discretion in balancing

the factor of contemporaneity with the specificity of the $0.44/kg. margin to Huahui.[7]

Albemarle next argues that the court's reasoning for rejecting the $0.28/kg. margin

assigned to unexamined respondents GHC, BPAC, and Shanxi DMD applies equally to the

$0.44/kg. margin assigned to Huahui in the third review as an unexamined respondent.

Albemarle's Comments 13-16.  But the reasoning does not apply equally.  The $0.28/kg. margin

Commerce assigned to GHC, BPAC, and Shanxi DMD was neither "based on data pertaining to

any pricing behavior that occurred in the third POR" nor "based on any data pertaining to these

---

[7] Additionally, Albemarle could have challenged Huahui's non-selection as an examined respondent in the third administrative review, provided Huahui properly had requested to be reviewed as a voluntary respondent under 19 U.S.C. § 1677m(a).  Had such a request been denied, Albemarle would have been in a position to challenge that denial before the court.  *See Dupont Teijin Films China LTD v. United States*, 38 CIT __, __, Slip Op. 14-106 at 29-31 (Sept. 11, 2014).

respondents." *Albemarle*, 27 CIT __, 931 F. Supp. 2d at 1291. Only the former, not the latter,

consideration applied with respect to the assignment of a margin for Huahui in the third review.

Albemarle argues, further, that the decision to assign the $0.44/kg. margin to Huahui in

the current review is unreasonable because one of the reasons given in the Remand

Redetermination, which is the Department's assertion that zero or *de minimis* margins never had

been calculated previously for mandatory respondents, is self-contradictory, irrelevant, and

baseless. Albemarle's Comments 11-13. According to Albemarle, "[i]f Commerce believes

temporal proximity is paramount, it cannot also reject the fully contemporaneous *de*

*minimis*/zero rates for all other respondents *in this review* in favor of a margin that is from a prior

period, no matter how near that period may be" because "Commerce cannot have it both ways."

*Id.* at 12. Albemarle adds that "it is wholly unreasonable to conclude," based on a finding that

no previous mandatory respondents had received a zero or *de minimis* margin, "that the separate

rate companies' margins must be frozen in time at rates calculated in earlier reviews." *Id.* at 12.

As to the assertion that "Commerce cannot have it both ways," the rationale Commerce

gave for its decision as to Huahui is not self-contradictory. Commerce did not say that temporal

proximity is paramount in all situations; instead, in the specific context of selecting a margin for

GHC, BPAC, and Shanxi DMD in the remand proceeding, it chose a contemporaneous margin

(zero) over a margin derived from the previous review ($0.28/kg.). On remand, Commerce

continued to follow a different rationale as to Huahui, and it did so in part for the reason the

court discussed above: unlike those three respondents, Huahui had been assigned an

individually-determined margin in the previous review. The characterization of the rationale as

"baseless" and "irrelevant" is also unconvincing. The absence of zero or *de minimis* margins for

any mandatory respondent in earlier reviews would not, in itself, be a reason sufficient to support

the Department's decision as to the margin to be applied to Huahui.  But it does not logically

follow that the Department's restating this rationale from the Decision Memorandum compels

the court to order a remand.  That Huahui's most recently calculated margin was not *de minimis*,

and that no margin calculated for any respondent (including Huahui) in a review prior to the third

review was *de minimis*, cannot fairly be characterized as "irrelevant" considerations.

Finally, Albemarle raises various arguments to distinguish the administrative decisions

relied upon by Commerce in the *Final Results*.  Albemarle's Comments at 16-17 & n.4.  Because

Albemarle failed to raise these arguments in its motion for judgment upon the agency record, *see*

*generally* Mem. of P. & A. in Support of Rule 56.2 Mot. for J. on the Agency R. by Pl.

Albemarle Corp. and Intervenor-Pl. Ningxia Huahui Activated Carbon Co., Ltd. (May 21, 2012),

ECF No. 45, it is precluded from raising them here.[8]  *See Novosteel SA v. United States,*

284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (holding that a party waives an argument if not raised

in its principal judgment brief).  Regardless, neither the court nor Commerce is bound by agency

determinations in unrelated administrative reviews.

C.  The Court Sustains the Department's Redetermined Surrogate Value for CCT's Carbonized
Material Input

In the Final Results, Commerce determined a surrogate value for CCT's carbonized

material input[9] using Global Trade Atlas ("GTA") statistics on imports under Indian Harmonized

---

[8] Although Albemarle's motion for judgment on the agency record contains language adopting the arguments made by the other consolidated plaintiffs in their respective motions for judgment on the agency record, those motions do not make the arguments Albemarle is attempting to make here.  *See e.g.* Mot. for J. on the Agency R. (May 18, 2012), ECF No. 42; Consol. Pls.' Rule 56.2 Mot. for J. upon the Agency R. (May 18, 2012), ECF No. 44.

[9] "Carbonized material" is the principal input used to produce activated carbon and can be "most any solid material that has a high carbon content" including "coal, wood, coconut shells, olive stones, and peat."  *Certain Activated Carbon from China,* Inv. No. 731–TA–1103, (continued . . .)

Tariff Schedule ("HTS") subheading 4402.90.10 ("Coconut Shell Charcoal"),[10] which had an

average unit value ("AUV") of 3,796.54 Indian rupees per metric ton ("Rs/MT").  *Albemarle*,

37 CIT at __, 931 F. Supp. 2d at 1286.  Commerce chose these statistics as the "best available

information," 19 U.S.C. § 1677b(c)(1), to value CCT's carbonized material over other data on

the record.[11]  *Albemarle*, 37 CIT at __, 931 F. Supp. 2d at 1286.

    Prior to issuing its opinion on the Final Results, the court informed defendant that the

record as filed appeared to lack the evidence on which Commerce had relied for its choice of the

"best available information," specifically, an expert report regarding the similarities between

coconut shell charcoal and coal-based carbonized materials.  *Id.* at __, 931 F. Supp. 2d at 1287.

Defendant sought, and the court granted, a voluntary remand so that Commerce could place the

relevant evidence on the administrative record "and consider comments from the parties in the

first instance."  *Id.* at __, 931 F. Supp. 2d at 1287-88.

    Commerce placed the report on the record on September 3, 2013 and provided an

opportunity for the parties to comment.  *Remand Redetermination* 1-2, 4; *Mem. from Bob Palmer*

---

USITC Pub. 3913, at I–5 (Apr. 2007) (Final).  The most common carbonized material used to
produce activated carbon in the United States and China is coal.  *Id.*

    [10] For the third administrative review, Commerce selected India as the primary surrogate
country for valuing examined respondents' factors of production; a selection no party challenges.
*Albemarle*, 37 CIT at __, 931 F. Supp. 2d at 1284.

    [11] The record also contained  Global Trade Atlas ("GTA") import data for Indian HTS
subheading 2704.00.90, "Other Cokes of Coal," which yielded an average unit value ("AUV") of
13,865.83 rupees per metric ton ("Rs/MT").  *Albemarle*, 37 CIT at __, 931 F. Supp. 2d at 1286.

*to the File*, ECF No. 114-1 (Pub. Remand. R. Doc. No. 1).  No party disputed the validity of the

report or its core findings.[12]  *Remand Redetermination* 22-23.

On remand, Commerce again valued CCT's carbonized materials according to the Indian

HTS "Coconut Shell Charcoal" data, explaining that the data result in a "better, input-specific

price for coal-based carbonized materials."  *Remand Redetermination* 8.  No party contests the

Department's redetermination.  Accordingly, because the Department's redetermination

complies with the court's opinion and order in *Albemarle*, and because no party opposes, the

court sustains this aspect of the Remand Redetermination.

D.  The Court Sustains the Department's Redetermined Surrogate Value for CCT's Coal and
Fines By-Products

In the Final Results, Commerce determined surrogate values for CCT's coal and fines

by-products, which result from CCT's production of carbonized materials, using GTA Indian

HTS import data.[13]  *Remand Redetermination* 8-9.  Based on these data, Commerce assigned

CCT's coal by-product an AUV of 4,860.88 Rs/MT and its fines by-product and AUV of

11,319.90 Rs/MT.  *Albemarle*, 37 CIT at __, 931 F. Supp. 2d at 1288-89.  Albemarle challenged

these surrogate values, arguing, *inter alia*, that they "result[ed] in an unreasonable and

inappropriate inversion in which the downstream by-products are valued considerably higher

than the upstream carbonized material."  *Id.* at __, 931 F. Supp. 2d at 1289 (citation omitted).

---

[12] Although Albemarle submitted comments to Commerce on the new record evidence,
these comments were limited to whether Commerce had used the "best available information"
and did not question the report's validity.  *Letter from Albemarle to the Sec'y of Commerce*
(Sept. 10, 2013), ECF No. 116-1 (Pub. Remand Rec. Doc. No. 2).

[13] Commerce "valued CCT's coal and fines by-products generated during the production
of carbonized materials using two GTA sources – import data under Indian HTS number
2701.19.90 'Other Coal W/N Pulvrsd But Ntagldmrtd' . . . and Indian HTS number 2714.10
'Bituminous Or Oil Shale And Tar Sands,' . . . respectively."  *Remand Redetermination* 8
(footnote omitted).

Without confessing error, defendant requested a voluntary remand so that Commerce could reconsider the by-product surrogate values, which the court granted. *Id.*

On remand, Commerce found no record evidence to show that CCT's by-products underwent further treatment or manufacturing "such that higher values than that of the main input may be considered reasonable." *Remand Redetermination* 10. Accordingly, Commerce capped both surrogate values at the value assigned to CCT's carbonized material input.[14] *Id.* Because the Department's redetermination complies with the court's opinion and order in *Albemarle*, and because no party opposes, the court sustains this aspect of the Remand Redetermination.

### III. CONCLUSION

For the reasons stated in the foregoing, the court affirms the Department's Remand Redetermination and will enter judgment accordingly.


                                                         /s/Timothy C. Stanceu
                                                         Timothy C. Stanceu
                                                         Chief Judge


Dated:  November 24, 2014
        New York, New York

---

[14] Commerce set the cap according to data under the Indian Harmonized Tariff Schedule subheading 4402.00.10 "Coconut Shell Charcoal." *Remand Redetermination* 10.